# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | |
|---|---|
| Cheryl Clevenger, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )  Case No. 1:02-cv-558 |
| | ) |
| Dillard's Department Stores, | ) |
| Inc., et al., | ) |
| | ) |
| Defendants. | ) |

ORDER

This matter is before the Court upon a number of motions filed by the parties.  The Court will initially set out the background of this case, address the procedural motions, and then address the several motions for summary judgment filed by the respective parties.

I.  Background

The facts giving rise to this dispute are as follows: Dillard's Department Stores, Inc. ("Dillard's") owns and operates a chain of over three hundred department stores in 29 states.  In 1998, Dillard's acquired a chain of stores called Mercantile Stores, which was based in Cincinnati, Ohio.  The transaction closed on August 13, 1998.  As part of the transaction, Dillard's acquired the Mercantile Stores Pension Plan (the "Plan"), which at the time of the acquisition had surplus assets of approximately $185 million.  Dillard's

1

was the sponsor of the Plan and, through the Mercantile Stores Pension Committee (the "Committee"), acted as Plan administrator.

On September 29, 1998, Dillard's terminated the Plan effective November 28, 1998.  Dillard's retained Towers, Perrin, Forster & Crosby, Inc. ("Towers Perrin") as its actuarial consultant to compute Plan benefits and provide administrative services.  Dillard's retained Joseph Hurst, Esq. of the law firm of Friday, Eldredge & Clark ("Friday Eldredge") to provide legal counsel regarding ERISA compliance.

Under federal law, 60 days before the Plan could begin final distribution of benefits, it needed to file both a Notice of Intent to Terminate with the Pension Benefit Guaranty Corporation ("PBGC"), the federal agency that regulates pension plan termination, and to distribute Notices of Plan Benefits to all Plan participants setting forth an estimate of their accrued benefits and the data the Plan used to calculate each participant's benefits.  See 29 C.F.R. § 4041.23, 4041.24.  If the PBGC took no action within 60 days of the filing, the Plan would have 180 days to distribute benefits to participants.  See 29 C.F.R. § 4041.28(a)(1)(i).  Dillard's filed its Notice of Intent to Terminate on November 23, 1998, thereby making January 23, 1999, the earliest date on which benefits could be paid.  At the same time, Towers Perrin distributed the Notices of Plan Benefits to the Plan participants.  Doc. no. 247, exhs. 6, 12, 13, 14.

The Plan was amended on February 4, 1996, and pursuant to the amendment, GATT (General Agreement on Tariffs and Trade) interest rates were adopted.  Doc. no. 247, exh. 18.  Pursuant to § 1.8 of the Plan, the applicable interest rate was the "annual

2

interest rate on 30-year Treasury securities for the October preceding the Plan Year in which occurs the Annuity Starting Date, as specified in guidance issued by the Treasury Department under section 417(e)(3) of the Code." Section 1.7 of the Plan defined the "Annuity Starting Date" as the "The first day of the first month for which an amount is payable under the Plan . . . even if actual payment is delayed for some reason."

The Plan was amended again on November 1, 1998. Towers Perrin assumes for purposes of its summary judgment motion only that the November 1998 amendment was validly adopted and was effective. Prior to 1998, all benefits valued at less than $3,500 had to be paid in a lump sum. There is some dispute as to whether the Plan annuitized all other benefits. The 1998 amendment, which was drafted by Mr. Hurst, guaranteed to all Plan participants the right to receive their pension benefits in the form of a one-time lump sum payment at the time of the Plan termination. Section 1.7 of the Plan was amended to provide that ". . . the Annuity Starting Date for all benefits paid on account of the Plan's termination pursuant to Section 12.2(c) shall be January 23, 1999, regardless of whether actual payment is delayed for some reason." Doc. no. 243, exh. 13. The 1998 Plan year ended on January 30, 1999. When the Plan years changed, the applicable interest rates for discounting the value of the participants' benefits to present value, which was necessary in order to determine the amount of a lump sum payment, resulted in a decrease in the interest rate from 6.33% (the 1998 Plan year rate) to 5.01% (the 1999 Plan year rate). Thus, using an annuity starting date of January 23, 1999, instead of the date of payment, resulted in use of the more favorable 1998 Plan year rate for Dillard's, even if

3

payments were not made until later.

There are some disputes as to what agreements the parties made and what information they exchanged regarding the timing of the distribution of the lump sum payments.  It is undisputed that a schedule for distributing payments was set out in letters dated November 13, 1998, and December 18, 1998, from Towers Perrin consultant Steve Klubock to another Towers Perrin employee, Cecil Hemingway, and Dillard's Chief Financial Officer, James Freeman.  The schedule attached to the December letter showed December 18, 1998, as the due date for the delivery of the election forms which permitted participants to elect to receive benefits in the form of a lump sum instead of an annuity and January 23, 1999, as the due date for the lump sum distributions, "assum[ing] no comments from the PBGC or other issues that delay the distribution."  Doc. no.247, exh. 14.

Prior to those letters, Mr. Klubock of Towers Perrin wrote in an e-mail dated September 24, 1998, to Mr. Hemingway, Towers Perrin principal Richard Sponenbergh, and others on the Towers Perrin team working on the Dillard's project that he had "told Joe [Hurst] it is highly unlikely that we will be able to calculate all accrued benefits and have employee elections by the end of the year."  Doc. no. 247, exh. 25.  Towers Perrin witnesses testified at their depositions that they warned Dillard's at a meeting on October 7, 1998, in Little Rock, Arkansas, that the schedule was going to be extremely difficult to meet, if not impossible.  Doc. no. 247, exh. 26, Klubock depo., vol. I, pp. 132-134; exh. 27, Klubock depo., vol. II, pp. 294-295; exh. 28, Sponenbergh depo., pp. 275-276; exh.

4

29, Lloyd depo., vol. I, pp. 204-207; exh. 30, Lloyd depo., vol. II, pp. 282-284, 322.

Towers Perrin personnel exchanged several internal communications regarding the

timing of the distributions, which included the following December 8, 1998, e-mail from

Mr. Klubock to Mr. Hemingway and others:

> Our goal is to get most of the final election form [sic] in the mail to participants by 12/18. We realize that there are many change forms and some employees will receive letters saying that we are reviewing the questions that they have brought up during their review of the data. The goal is to get as many of the active participants paid out by the end of January [as possible].

Doc. no. 247, exh. 38. In addition, Towers Perrin employee Tom Cannon sent the

following e-mail to Mr. Klubock and Mr. Hemingway on December 11, 1998:

> Yes, we will try to get the final election forms out by 12/18, however, it is not likely. The date as I understand is not critical and could move a couple of days if we need the additional time to get the election forms out. If we get the forms back as of 1/23/99, it will be physically impossible to make payments before early February as we will need to accumulate the forms and get the distribution information into a form that can go to Citibank to be processed.

Doc. no. 247, exh. 39.

On December 18, 1998, Mr. Klubock and Mr. Hemingway and other Towers

Perrin personnel sent the above-referenced letter with the schedule attached to Mr.

Freeman, and they copied Dillard's internal and external legal counsel. Doc. no. 247,

exh. 14. The letter stated, in pertinent part, as follows:

> The attachment updates the schedule for the termination of the Plan. The next major milestone is December 18th, when the election forms will be mailed to all participants. This will provide for the employees to elect either a lump sum or an annuity. We are slightly behind schedule. Forms

for active employees will be mailed starting December 21st, followed shortly by the letters for retirees and terminated vested participants.

Please note that we are receiving 200-300 letters and phone calls *per day* from participants relating to changes in address, dates of birth, questions regarding their pension benefit amounts, etc.  In November, the Associate Benefit Center researched over 22,000 phone calls.  Responding to these calls and researching data questions will likely delay final distributions of benefits to the affected employees.  We will have a better idea of the status of the questionable employees within the next few weeks.

On January 13, 1999, Towers Perrin employee Jay Popky e-mailed to Mr. Hurst a "draft Q & A memo" for distribution to Mercantile employees.  It stated at Q & A No. 11 that lump sum payments were expected to be made on or about February 28, 1999, for active and retired employees.  Doc. no. 247, exh. 45.  Neither Dillard's nor Mr. Hurst provided a written response to Mr. Popky.  Subsequently, on January 26, 1999, Mr. Hurst wrote in an e-mail to Towers Perrin  that Mr. Freeman had "told me today in no uncertain terms that he wants checks to roll out starting Friday [January 29]."  Doc. no. 245, Dillard's exh. 184.

Towers Perrin starting mailing lump sum payments on February 8, 1999, at which time checks were distributed to 1,298 participants.  Doc. no. 247, exh. 54.  Towers Perrin distributed virtually all lump sum payments by April 26, 1999.  Doc. no. 247, exh. 55.  Towers Perrin used a January 23, 1999, annuity starting date and the 1998 Plan year rate to calculate lump sum payments, even though actual payments were made in the 1999 Plan year.

After learning that lump sum payments were not made by the annuity starting date

of January 23, 1999, Dillard's General Counsel Paul Schroeder consulted with Mr. Hurst concerning whether Dillard's should use a different interest rate for lump sum calculations. Doc. no. 247, exh. 59, Schroeder depo., p. 243. Dillard's did not thereafter change the interest rate for the vast majority of participants. Id. at 243-44.

After all of the Plan participants had received their benefits, Dillard's received a reversion of $80 million in surplus assets from the Plan. Doc. no. 247, exh. 62. The remaining surplus assets were put aside to fund future Dillard's contributions to its separate 401(k) plan.

In 2001, the PBGC audited the Plan termination. Doc. no. 247, exh. 64. One of the issues investigated was why the 1998 Plan year interest rate was used to calculate lump sum distributions that were not made until the 1999 Plan year. See doc. no. 247, exh. 65. Towers Perrin's response to the PBGC, which both Mr. Hurst and Dillard's employee Phillip Watts reviewed before it was sent, stated that lump sums were calculated by using the annuity starting date specified in the Plan, and federal law permitted payments to be made after the annuity starting date if there was reasonable administrative delay in processing the payments. Doc. no. 247, exhs. 66, 67, 68. The PBGC took no further action and closed its investigation. Doc. no. 247, exh. 69.

Two Plan participants challenged the computation of their lump sum benefits. On August 10, 1999, Cindy Gold wrote to the Plan and argued that the Plan should have computed her distribution using the more favorable 1999 Plan year rate. Mr. Hurst, writing on behalf of the Committee, responded, in part, as follows:

Pursuant to Section 1.8, the Plan provides that an annual stability period (i.e., the Plan year ending January 31) will be used for purposes of determining lump sum cash-out interest rates.  It further provides (also in Section 1.8) that the interest rate that applies for a stability period is the average rate on 30-year Treasury securities for the month of October immediately preceding the start of each stability period.  In addition, Section 1.8 of the Plan stipulates that the relevant stability period used is the stability period in which the "annuity starting date" for a distribution occurs.  In your case, the annuity starting date was January 23, 1999.  This is the date as of which the value of your distribution was determined.  It is the same date that would have been used to determine your annuity payments had you elected that form of distribution instead of a lump sum. Pursuant to Section 1.7, the annuity starting date is not the same as the date on which benefits were actually paid to you.  Since the annuity starting date occurred in the stability period that began on February 1, 1998, the appropriate rate of interest to use in accordance with Section 1.8 is the rate for October of 1997.

Doc. no. 247, exh. 19.

8

Following an appeal of that decision, Mr. Hurst wrote again on behalf of the

Committee:

> As required by the [PBGC], distributions from a terminating plan must be completed no later than 180 days from the end of the PBGC review period, or if later, 120 days from the receipt of the Internal Revenue Service determination letter.  The Annuity Starting Date of January 23, 1999 was established by reference to the filing of the Plan for termination with the PBGC.  The PBGC Form 500 was submitted on November 23, 1998, and the PBGC review period ended 60 days thereafter on January 22, 1999.  January 23, 1999 was the first day of the 180-day PBGC period for making distributions under the Plan.  To facilitate the actuarial calculation of Plan benefits for over 30,000 Plan Participants, and to provide a reasonable degree of certainty that distributions could be accomplished within the time frames required by the PBGC, the [November 1, 1998] amendment required all Participants who elected either one of the one time options to have their benefits determined as of the Annuity Starting Date of January 23, 1999.

Doc. no. 247, exh. 72.

In addition, Plaintiff Clevenger challenged the computation of her lump sum

benefit.  In addition to explaining why January 23, 1999, had been used as the annuity

starting date, the Committee explained that it had concluded that the payment of her lump

sum was not unreasonably delayed:

> The Committee has investigated why the Trustee of the Plan did not send your benefit payment before March 9, 1999.  As stated above, there was an immense amount of administrative work carried out by Towers Perrin in order to insure that approximately 30,000 participants and their beneficiaries received their benefits in a timely manner.  Enclosed is a copy of a letter from Towers Perrin, the actuary to the Plan, regarding the calculation of your benefit.  In their letter they have represented that your benefit was processed as soon as administratively possible.  The Committee's investigation leads it to believe that the payment of your benefits was not unreasonably delayed after the Annuity Starting Date.

Footnote 1 to this paragraph quoted Treasury Dept. Regulation § 1.401(a)-20(b)(3), which

9

states that "A payment shall not be considered to occur after the annuity starting date merely because actual payment is reasonably delayed for calculation of the benefit amount if all payments are actually made."  Doc. no. 247, exh. 73.

Following termination of the Plan, the Plaintiff Class brought suit. Plaintiffs filed the initial complaint on July 29, 2002, followed by a Second Amended Class Action Complaint in December 2004.  The Plaintiffs alleged that all or part of the surplus assets were not based upon actuarial error, as allegedly required in order for Dillard's to receive a reversion, so that the reversion violated the terms of the Plan (Count I); the surplus was artificially inflated as a result of the Plan amendments made within five years of the termination, in violation of ERISA (Counts II-IV); the interest rate for computing lump sum payments to participants was allegedly improperly calculated using a fixed annuity starting date of January 23, 1999, as opposed to the date of actual payment, resulting in decreased payments to participants (Count V); differences in the provision of "shut-down" benefits to older employees and younger employees resulted in discrimination against older employees on the basis of their age in violation of ERISA (Count VI); the amendments illegally cut back participants' accrued benefits by manipulating the interest rates used to compute lump sum distributions (Count VII); and defendants failed to disclose to a small subset of Plan participants the possibility of deferring the receipt of lump sum distributions for a period of time to insure a more favorable interest rate for computing lump sum distributions in violation of ERISA (Count VIII).

In early 2005, Dillard's, the Plan and the Committee ("Third-Party Plaintiffs")

filed a third-party action against Towers Perrin.  They filed a Second Amended Third-Party Complaint on May 25, 2005.  Doc. no. 79.  They sought indemnification, under both the common law and ERISA, from Towers Perrin primarily based on Count V (claiming that lump sum payments should be computed using an interest rate based on the date of actual payment as opposed to the Plan's fixed annuity starting date) and on Count VIII (claiming that Defendants had violated ERISA by failing to inform certain participants eligible to receive severance benefits from the Plan that they could elect a more favorable annuity starting date under the terms of the "Shut Down Amendment" establishing their severance benefits).  They also brought claims for breach of contract and for various torts.       On February 14, 2006, Towers Perrin asserted a counterclaim against Dillard's, claiming that Dillard's had made false representations regarding the quality of the Plan participant data.  Doc. no. 98, ¶¶ 122-136.  Towers Perrin also asserted an indemnification claim against Friday Eldredge.

Third-Party Plaintiffs and the Class Plaintiffs subsequently reached a Settlement Agreement, whereby Third-Party Plaintiffs agreed to pay the Class $35 million.  Doc. no. 137.  The Court approved the Settlement Agreement.  The Settlement Agreement, ¶ 4.3, defined the Class as "all participants in the [Plan] who received a lump sum distribution from the Plan after January 30, 1999 and/or received a Shut Down benefit from the Plan." In the Agreement, ¶ 5.8, the settling parties agreed to allocate the Settlement funds as follows:

The Settlement Payment is consideration for dismissal of all claims that are

11

or could have been brought by Plaintiff against Defendants in the Second
Amended Complaint.  Based on the distributions to Plan participants,
approximately 5.32% of the Settlement Payment is being paid as if Plaintiff
had prevailed on the claims advanced in Count VI of the Second Amended
Class Action Complaint, while 94.68% of the Settlement Payment is being
paid as if Plaintiff had prevailed on the claims advanced in Counts V and
VIII of the Second Amended Complaint.

Towers Perrin objected to the Class Settlement, and specifically to the allocation
paragraph.  Third-Party Plaintiffs challenged Towers Perrin's standing to object.  At the
hearing on the Motion for Preliminary Approval of the Class Action Settlement
Agreement on October 30, 2006, this Court stated that it viewed the allocation as
"Dillard's unilateral subjective assessment of the legal issues" and that it could not see
that the allocation would prejudice Towers Perrin if the matter went to trial.  The Court
therefore overruled Towers Perrin's objections to the Settlement Agreement for lack of
standing.

## II.  Motions

Third-Party Plaintiffs and Towers Perrin are now before the Court seeking
summary judgment on the Third-Party Plaintiffs' common law claims for indemnity,
negligence, malpractice, professional misconduct and negligent misrepresentation.  The
Third-Party Plaintiffs claim that they are entitled to summary judgment on the following

grounds:

1.  They afforded Towers Perrin an opportunity to participate in the settlement, Towers Perrin's conduct caused them to be exposed to liability to the Plaintiff Class, the Settlement is fair and reasonable, and Towers Perrin is liable for the Settlement paid to Plaintiffs because Towers Perrin's failure to provide election forms and to pay lump sum distributions in a timely manner, i.e., within the 1998 Plan Year, was the result of negligence and caused the Third-Party Plaintiffs to be liable to the Plaintiff Class.

2.  Towers Perrin cannot argue that Dillard's would not have been liable to the Plaintiff Class for causes of action brought as a result of Towers Perrin's negligent conduct.

3.  Towers Perrin acted negligently in failing to pay the lump sums  before the end of the 1998 Plan Year to participants who returned election forms in January 1999.

4.  Towers Perrin committed malpractice by missing key deadlines for sending election forms and making payments of lump sums without notifying its clients of the risk of failure and by then relying on an improper interpretation of a Plan amendment to cover its failure.

5.  Towers Perrin negligently misrepresented the status of the Plan termination by consistently advising Third-Party Plaintiffs in writing that the "due date" for sending election forms and paying lump sums remained on schedule.

In response, Towers Perrin alleges that in order to prevail on their claims for common law indemnification, Third-Party Plaintiffs must show both that Towers Perrin's conduct caused them to be liable in the underlying action and that the Settlement allocation was reasonable.  Towers Perrin claims that the undisputed evidence does not prove that Third-Party Plaintiffs were liable on Count V of the Class Complaint.  Rather, Towers Perrin asserts that it has proved in its own motion for summary judgment and other filings that the delay in payments from the January 23, 1999, annuity starting date to February, March and April 1999 was well within the scope of the administrative delay

rule, pursuant to which the plan-specified annuity starting date will apply even if payments are not made on that date if the delay is the result of reasonable administrative delay. See 26 C.F.R. § 1.401(a)-20, Q & A-10(b)(3).

Towers Perrin further contends that there is no evidence in the record to support the Third-Party Plaintiffs' attempts to allocate approximately 95% of the Settlement payment to two counts of the complaint. To support its claim that the allocation is not proper, Towers Perrin has submitted an expert report by former PBGC counsel Gary Ford, Esq., who opines that Third-Party Plaintiffs faced exposure on other claims brought by the Plaintiff Class.[1]

In reply, Third-Party Plaintiffs claim that Towers Perrin's conduct caused them to be liable on Counts V and VIII for the following reasons:

- Case law and ERISA mandate use of the date of distribution for calculating lump sum distributions (unless the designated annuity starting date actuarial assumptions result in a larger distribution). See PBGC v. Wilson N. Jones Memorial Hospital, 250 F.Supp.2d 676, 683 (E.D. Tex. 2003), aff'd, 374 F.3d 362 (5th Cir. 2004); 29 C.F.R. § 4044.73 (1999); 26 C.F.R. § 1.417(e)-1(d)(1999); 26 C.F.R. § 1.417(e)-1(b)(3)(iv)(C)(2007); IRC § 1.417.

- Title 26 C.F.R. § 1.417(e)-(1)(d)(1999) requires use of the 1999 Plan year rate for all lump sum distributions ("The time and method for determining the applicable interest rate for each participant's distribution must be determined in a consistent manner that is applied uniformly to all participants in the plan.")

---

[1]Third-Party Plaintiffs have filed a motion to exclude Mr. Ford's report. Doc. no. 250.

- Towers Perrin's failure to send election forms to be received by Plan participants at least 30 days before January 23, 1999, as required by ERISA, mandates use of the date of distribution as the annuity starting date.

Third-Party Plaintiffs contend that the administrative delay defense asserted by

Towers Perrin as justification for use of the 1998 Plan year rate fails for the following

reasons:

- It is inapplicable to the district court's conclusion in <u>Wilson N. Jones</u> that the annuity starting date for a lump sum distribution is the date of distribution.

- It is inconsistent with 29 C.F.R. § 4044.73, which provides that the "value of the lump sum . . . form of distribution is the present value of the normal form of benefit provided by the plan payable at normal retirement age, determined as of the date of distribution."

- It is inapplicable to the PBGC's analysis contained in its brief on appeal in <u>Wilson N. Jones</u> that "a plan provision can never 'lock in' a particular annuity starting date."

- It is inapplicable to Towers Perrin's failure to send election forms in a timely fashion.

- It ignores Towers Perrin's December 11, 1998, decision to make no payments during the 1998 Plan year, even though Towers Perrin's own expert purportedly concedes that Towers Perrin could have paid thousands of Plan participants before the end of the 1998 Plan year.

- The defense applies only to multiple payment annuities, rather than single lump sum distributions, in light of the language that administrative delay may be applicable with respect to an annuity starting date "if all payments are actually made."

Before addressing these arguments, the Court will rule on the parties' procedural

motions.

A.  Motion to strike affidavit of Paul Schroeder, Esq. (doc. no. 253)

Towers Perrin moves the Court to strike the affidavit of Paul Schroeder, Esq., (doc. no. 244), Vice-President and General Counsel of Dillard's, a member of the Committee, and a Director of Mercantile.  Third-Party Plaintiffs oppose the motion.  Doc. no. 257.

In his affidavit, Mr. Schroeder recounts some of the background facts of the case, describes events giving rise to the Class Action and the third-party claims against Towers Perrin, discusses his assessment of the claims brought by the Plaintiff Class and what he believes to be the Third-Party Plaintiffs' potential exposure to liability on each of the claims, explains his involvement in the settlement process, and states why he believes the Settlement Agreement and the allocation of damages to certain claims was fair and reasonable.  Towers Perrin moves to strike the affidavit on the ground that Third-Party Plaintiffs never disclosed Mr. Schroeder as an expert witness in violation of Fed. R. Civ. P. 26(a)(2)(A), and his testimony as to the relative merits of the Plaintiff Class's ERISA claims is incompetent because he is not qualified as an ERISA expert.

In response, Third-Party Plaintiffs contend that Mr. Schroeder's opinions are proper under Fed. R. Ev. 701, which allows lays witnesses to testify about their opinions that are rationally based on the perception of the witness, helpful to a clear understanding of the witness's testimony or the determination of a fact in issue, and not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.  Third-Party Plaintiffs allege that Mr. Schroeder was personally involved in the litigation and can

16

testify as to his knowledge of the reasons for the Settlement, and thereby assist the Court in evaluating the reasons for the Settlement.  They also contend that they were not required to provide an expert report for Mr. Schroeder because he was not retained or specially employed to provide expert testimony.

The Court declines to strike Mr. Schroeder's affidavit from the record.  The affidavit is not entirely improper but includes averments regarding certain factual matters within Mr. Schroeder's personal knowledge.  The motion to strike the affidavit of Paul Schroeder (doc. no. 253) is therefore **DENIED**.

B.  Motion for leave to file sur-reply and motion to strike (docs. no. 294, 297)

Towers Perrin has filed a motion for leave to file a sur-reply in opposition to Third-Party Plaintiffs' motions for summary judgment.  Doc. no. 294.  Third-Party Plaintiffs have filed a motion to strike the sur-reply memorandum.  Doc. no. 297.  Both motions are opposed.  Docs. no. 309, 310.

Towers Perrin objects to Third-Party Plaintiffs' attempt to raise the following  two purportedly new arguments in opposition to its contention that the administrative delay regulation permitted lump sum payments to be computed based on the annuity starting date specified in the Plan rather than on the date of distribution: (1) the provisions of 29 C.F.R. § 4044.73 preclude Tower Perrins' contention, and (2) the administrative delay rule does not apply to lump sum payments.  Towers Perrin requests that it be granted leave to respond to these arguments in a sur-reply memorandum, which it has attached to its motion, because the administrative delay issue is at the heart of this case and could be

17

dispositive.

Third-Party Plaintiffs contend that Towers Perrin's motion should be stricken from the record because Towers Perrin has not shown good cause for filing the sur-reply as required by S.D. Ohio Local Rule 7.2(a)(2), which provides that no additional memoranda beyond those specified "will be permitted except upon leave of court for good cause shown." Third-Party Plaintiffs contend that both sides addressed the administrative delay defense in numerous prior filings. They also contend that the arguments Towers Perrin raises in the sur-reply are without merit.

Third-Party Plaintiffs' motion to strike Towers Perrin's motion (doc. no. 297) is **DENIED**. If a party moves for leave to file a supplemental memorandum and good cause is lacking, then the appropriate action for the Court to take is to deny the motion seeking leave to file the memorandum. Striking the motion is not warranted.

The Court has reviewed the proposed sur-reply and the response, which are in addition to the large number of extensive briefs already filed in connection with the summary judgment proceedings. The Court finds that it is not necessary for any party to submit additional briefing in order to present its position on critical issues that have been exhaustively analyzed and argued. The Court has carefully considered the issues, the parties' positions, and the applicable law. Towers Perrin will not be prejudiced if it is denied leave to submit additional briefing on these matters. Accordingly, Towers Perrin's motion for leave to file the sur-reply (doc. no. 294) is **DENIED**.

C. Motions to exclude (docs. no. 250, 252, 304, 305)

Third-Party Plaintiffs have filed motions to exclude the report and testimony of Gary Ford, Esq. (doc. no. 250), Frank Cummings, Esq. (doc. no. 252), and Terry Musika (doc. no. 305).  Towers Perrin has filed a motion to exclude, in part, the report and testimony of James Colburn (doc. no. 304).

Because this matter will be tried to the Court, it is not imperative that the Court exercise its gatekeeping function and determine prior to trial which, if any, of the opinions offered by these individuals should be excluded from evidence.  Rather, the Court will consider in the context of the evidence presented at trial whether the opinions are admissible into evidence.  The motions are therefore **DENIED** without prejudice to the parties' right to make any objections to the reports and testimony as they deem appropriate at trial.

D.  Summary judgment motions (docs. no. 240, 242, 243, 247, 248)

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The evidence presented on a motion for summary judgment is construed in the light most favorable to the non-moving party, who is given the benefit of all favorable inferences that can be drawn therefrom.  United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986) (emphasis in original).

The court will not grant summary judgment unless it is clear that a trial is unnecessary.

The threshold inquiry to determine whether there is a need for trial is whether "there are

any genuine factual issues that properly can be resolved only by a finder of fact because

they may reasonably be resolved in favor of either party." Anderson, 477 U.S. at 250.

There is no issue for trial unless there is sufficient evidence favoring the non-moving

party for a jury to return a verdict for that party. Id

Although summary judgment must be used with extreme caution since it operates

to deny a litigant his day in court, Smith v. Hudson, 600 F.2d 60, 63 (6th Cir. 1979), the

"[s]ummary judgment procedure is properly regarded not as a disfavored procedural

shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed

to 'secure the just, speedy and inexpensive determination of every action.'" Celotex

Corp. v. Catrett, 477 U.S. 317, 327 (1986).

### 1. Towers Perrin's motion for summary judgment on the Plan and Committee's claims (doc. no. 248)

Towers Perrin moves for summary judgment on the claims brought against it by

the Plan and the Committee on the same grounds it asserts with respect to the claims

brought against it by Dillard's, and for the additional reason that their claims fail for lack

of standing. Towers Perrin claims that the Plan and the Committee suffered no injury as a

result of the Settlement because there is no evidence that they had any assets at the time

of the Settlement or that they contributed to the Settlement payment. Rather, Towers

20

Perrin asserts that Dillard's funded the Settlement in its entirety.

Third-Party Plaintiffs claim that the Plan has constitutional standing to the extent that it is being used as the funding vehicle for the payment of moneys to Plan participants whose lump sum distributions were calculated at the 6.33% rate.  In addition, they contend that the Plan and the Committee have constitutional standing to recover defense costs resulting from the Class Action.

In reply, Towers Perrin contends that the Plan and Committee have offered no proof that they, as opposed to Dillard's, actually used their own funds to pay legal bills. Towers Perrin also disputes that the passing of payments through the Plan is sufficient to bestow standing since after the Settlement payment is distributed, the Plan will be in the same position it was in before the Class Action began.

For a party to have the requisite standing under federal law, that party must satisfy both Article III requirements and prudential considerations.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992); Jet Courier Services, Inc. v. Federal Reserve Bank of Atlanta, 713 F.2d 1221 (6th Cir. 1983).  In order to satisfy Article III requirements, the plaintiff must have suffered an injury-in-fact, which is both actual or imminent and concrete and particularized. Additionally, a causal connection between that injury and the conduct complained of must exist, and it must be likely "that the injury will be 'redressed by a favorable decision.'"  Lujan, 504 U.S. at 561 (citing Simon v. Eastern Ky. Welfare Rights Organization, 426 U.S. 26, 41-42 (1976)).  The prudential considerations the court examines to determine standing include whether plaintiff is asserting its own legal rights

and interests as opposed to the rights or interests of a third party.  Warth v. Seldin, 422 U.S. 490, 499 (1975).  The party asserting federal jurisdiction bears the burden of establishing its standing.  Lujan, 504 U.S. at 560.

The Court finds that the Plan and the Committee have failed to demonstrate that they have standing to pursue their claims against Towers Perrin.  Because the Plan was terminated prior to the Class Action Settlement Agreement, the now-defunct Plan has not shown that it suffered an injury that will be redressed by a favorable decision against Towers Perrin, even if the Plan somehow continues to serve as the vehicle for the distribution of lump sum payments to the Class members.  The same is true of the Committee.  Neither the Plan nor the Committee has alleged that it contributed to the Settlement payment, and neither has offered any evidence to show that it incurred legal fees in the defense of the Class Action lawsuit.  Accordingly, both the Plan and the Committee have failed to carry their burden to establish standing to pursue their claims against Towers Perrin.

For these reasons, Towers Perrin's motion for summary judgment on the claims asserted against it by the Plan and the Committee (doc. no. 248) is **GRANTED**.  The Plan and the Committee are **DISMISSED** as parties to the lawsuit.

2.  Cross-motions for summary judgment on Dillard's claims (docs. no. 242, 243, 247)

Dillard's has filed a motion for summary judgment on Count II of its Second Amended Third-Party Complaint for breach of contract against Towers Perrin.  Doc. no. 242.  Towers Perrin opposes the motion.  Doc. no. 256.  Dillard's has filed a reply in

support of the motion. Doc. no. 270. Dillard's contends that there is no genuine issue of material fact as to whether Towers Perrin breached certain oral and written contracts or promises between the parties concerning the provision of actuarial and administrative services and the distribution of benefits payments to the Plaintiff Class represented by Cheryl Clevenger and whether Dillard's suffered damages as a result of Towers Perrin's breaches, specifically damages in the form of payment of a Settlement amount of $33.2 million to the Plaintiff Class.

Dillard's also brings a motion for partial summary judgment as to liability on Counts I (common law indemnification), III (negligence), IV (malpractice or professional misconduct) and V (negligent misrepresentation) of its Second Amended Third-Party Complaint against Towers Perrin. Doc. no. 243. Towers Perrin has combined its opposition to this motion with the memorandum opposing the motion for summary judgment on Count II. Doc. no. 256. Dillard's has filed a reply in support of the motion. Doc. no. 264.

Towers Perrin has filed a cross-motion for summary judgment on the claims asserted against it by Dillard's. Doc. no. 247. Dillard's has filed an opposing memorandum (doc. no. 254) and Towers Perrin has filed a reply memorandum. Doc. no. 265.

a. Common law indemnification

The Court must determine whether either Dillard's or Towers Perrin is entitled to summary judgment as a matter of law on the indemnification claims asserted against

Towers Perrin by Dillard's.

i. <u>Applicable law</u>

The rule of indemnity provides that "where a person is chargeable with another's wrongful act and pays damages to the injured party as a result thereof, he has a right of indemnity from the person committing the wrongful act, the party paying the damages being only secondarily liable; whereas, the person committing the wrongful act is primarily liable." <u>Reynolds v. Physicians Ins. Co. of Ohio</u>, 68 Ohio St.3d 14, 16, 623 N.E.2d 30, 31 (1993) (citing <u>Travelers Indemn. Co. v. Trowbridge</u>, 41 Ohio St.2d 11, 14, 321 N.E.2d 787, 789 (1975)).  Therefore, one party must be "chargeable" with the wrongful act of another as a prerequisite to indemnity.  <u>Jones v. Bank One, Cincinnati</u>, 1998 WL 892245, *2 (Ohio App. 1 Dist.,1998) (unpublished decision) (citing <u>Convention Center Inn Ltd. v. Dow Chemical Co.</u>, 70 Ohio App.3d 243, 590 N.E.2d 898 (1990)).

Pursuant to the rule of indemnity, "[w]hen a person is secondarily liable due to his relationship to the other party, and is compelled to pay damages to an injured party, he may recoup his loss for the entire amount of damages paid from the one who is actually at fault, and who, in fact, caused the injuries." <u>Reynolds</u>, 68 Ohio St.3d at 16, 623 N.E.2d at 31  (citing <u>Globe Indemn. Co. v. Schmitt</u>, 142 Ohio St. 595, 603, 53 N.E.2d 790, 794 (1944)).

"[I]n order to qualify for indemnification, the party claiming the right must be merely passively negligent."  <u>Mahathiraj v. Columbia Gas of Ohio, Inc</u>., 84 Ohio App.3d 554, 564, 617 N.E.2d 737, 744 (1992).  "[W]here two parties actively participate in the

commission of a tort they are deemed concurrent or joint tortfeasors, and no right of indemnification exists between the two, although a right of contribution may be proper." Id.

The right of indemnity may arise from an express agreement or contract, or it may be implied from a contractual agreement or relationship. Worth v. Aetna Cas. & Sur. Co., 32 Ohio St.3d 238, 240, 513 N.E.2d 253 (1987). In contrast to an express agreement, an implied right to indemnity should be recognized when the party committing the wrong "is so related to a secondary party as to make the secondary party liable for the wrongs committed solely by the other." Reynolds, 68 Ohio St.3d at 16, 623 N.E.2d at 31.

The right to indemnity may exist where the "one proceeded against in the first instance settles the loss voluntarily . . ." Globe, 142 Ohio St. at 604, 53 N.E.2d at 794. Additional prerequisites for indemnity exist where a claim is not litigated but is settled. In order to collect indemnity for sums paid in settlement of a claim, the party seeking indemnity must prove that (1) the one seeking indemnity gave proper and timely notice to the one from whom indemnity is sought; (2) legal liability required the settlement; and (3) the settlement was fair and reasonable. Id. at 604, 53 N.E.2d at 794. Stated otherwise, "it must appear that the party seeking indemnity was himself legally liable and could have been compelled to satisfy the claim." Jones, 1998 WL 892245, *2 (citation omitted).

Thus, under Ohio law, a party seeking indemnification following a settlement must prove "both that the right to indemnification applies to the claim and that such a remedy is appropriate in light of the factual requirements of Globe." Blair v. Mann, 1999 WL

25

228265, *2 (Ohio App. 4 Dist. 1999) (unpublished decision).  The initial inquiry is a question of law, while the latter is usually a question for the trier of fact.  <u>Id</u>. (citing <u>Dow Chemical</u>, 70 Ohio App.3d at 247, 590 N.E.2d at 898.

ii.  <u>The parties' arguments</u>

As to the first requirement for indemnification, Dillard's claims that Towers Perrin

had proper and timely notice and the opportunity to participate in the settlement.

With regard to the second requirement, Dillard's claims that reasonable minds can

only conclude that Towers Perrin's omissions caused Dillard's to be exposed to legal

liability to the Plaintiff Class.  Dillard's contends that in defending against the allegations

of Counts V and VIII, it relied upon the premise that the November 1998 Plan

amendment established an annuity starting date of January 23, 1999, which fixed the

interest rate to be applied for lump sum distributions at the 1998 Plan year rate of 6.33%.

Dillard's alleges that Towers Perrin calculated lump sum distributions at the incorrect

1998 Plan year interest rate due to (1) Towers Perrin's failure to send election forms to

Plan participants in time for them to receive the forms at least 30 days before the Plan's

designated annuity starting date of January 23, 1999, (2) its failure to provide Plan

participants an affirmative waiver and notice of right to rescind for retroactive notices,

and (3) its failure to make distributions within the 1998 Plan year.

Dillard's further alleges that it mistakenly understood prior to discovery that

Towers Perrin's failure to make lump sum distributions within the 1998 Plan year was

excused by the concept of administrative delay, which assumes that all requirements

necessary for payment had been completed in a timely manner but that payment had been

inadvertently delayed.  Dillard's claims that any possibility of prevailing on such an

argument ended when it was revealed that (1) Towers Perrin had paid some benefits at the

1998 Plan year rate of 6.33% and others at the 1999 Plan year rate of 5.01%, and (2) Towers Perrin was aware seven weeks before the end of the Plan year that it could not, or would not, deliver on its obligations to send election forms by the allegedly promised date of December 18, 1998, and to make payments by the end of the 1998 Plan year. Dillard's claims that the latter revelation proved that Towers Perrin's incompetence in managing the project, rather than administrative delay, caused the failure to pay any benefits by the end of the 1998 Plan year. Dillard's further contends that Towers Perrin was dishonest to the PBGC and to Dillard's in failing to admit that it recognized in December 1998 that it would not be able to complete its tasks by the end of January 1999. Dillard's claims that Towers Perrin's known inability to complete payments within this time frame meant that the annuity starting date would be the 1999 rate in accordance with 26 C.F.R. § 1.401(a)-20 Q&A-10(b)(1)[2] and the case law. See Wilson N. Jones, 250 F.Supp.2d 676.

As to the third requirement for indemnification, Dillard's alleges that the Settlement was fair and reasonable as determined by both this Court and an independent fiduciary, Nell Hennessey, Esq. Dillard's asserts that the Plaintiff Class agreed to a stipulation allocating the damages of approximately $33.2 million based on damages they would have suffered under the theories detailed in Counts V and VIII of the Class Complaint. Dillard's claims that it proved through expert testimony that the Settlement is fair and reasonable in light of its potential exposure under these counts. Specifically, it

---

[2]The regulation defines the term "annuity starting date" for purposes of § 417 as "the first day of the first period for which an amount is paid as an annuity or any other form."

retained actuary Sally Cuni to verify the payment amounts Towers Perrin had calculated using the 6.33% 1998 Plan year interest rate and to calculate those same payments using the 5.01% 1999 Plan year rate, and her calculations yielded a difference of $37,910,568 (the relief the Plaintiff Class would purportedly be entitled to recover if they prevailed at trial on Counts V and VIII, not taking into account attorney fees and interest).  Doc. no. 243, exh. 17.

In response, Towers Perrin argues that the Court's opinion approving the Class Settlement does not foreclose its defense of this case and, in fact, Dillard's is estopped from arguing that it does.  Towers Perrin notes that when addressing at the preliminary approval stage Dillard's argument that Towers Perrin lacked standing to raise an objection that the allocation of the Settlement to various claims would be prejudicial to it, the Court stressed that the allocation was not binding on Towers Perrin by stating as follows:

> I view it as Dillard's unilateral subjective assessment of the legal issues. And if a ruling on a motion *in limine* is tentative, then a ruling on a motion *in limine* that hasn't been filed yet is exceedingly tentative.  But I can't see that this would inure to the prejudice of Towers Perrin in the event that it went - this matter went to trial.

Doc. no. 237, p. 15.

In any event, Towers Perrin claims that Dillard's has not put forth any evidence to support its theory of allocation of Settlement amounts to the various counts in the complaint, so that Dillard's has not shown that the amount it seeks from Towers Perrin is a reasonable approximation of Dillard's actual liability on Count V.  Also, Towers Perrin

claims that Dillard's has not shown that its damages are anything more than speculation.

Towers Perrin further argues that in assessing the fairness and reasonableness of the Settlement, the Court was obligated to consider only the interests of the absent class members, and the matter of how the Settlement amounts were allocated among the various claims was of no relevance to that particular assessment. Towers Perrin asserts that Dillard's must now demonstrate that the Class Settlement was a reasonable assessment of liability from the standpoint of the defense because a defendant's liability cannot be fixed by agreement between the plaintiff and other defendants without another party's consent or satisfactory judicial proceedings. Towers Perrin suggests that absent consent and satisfactory judicial proceedings, there is no notice and an opportunity to defend.

Towers Perrin also contends that Dillard's cannot rely on the independent fiduciary's opinion that the Settlement is not an illegal prohibited transaction under ERISA to support its allocation theory. Towers Perrin contends that the report is inadmissible hearsay under Fed. R. Ev. 801(c) and, in any event, the independent fiduciary neither considered the reasonableness of the Class Settlement from the standpoint of the defendant nor offered an opinion as to the reasonableness of Dillard's allocation theory.

Towers Perrin further argues that the opinion of Dillard's General Counsel, Mr. Schroeder, assessing 0% risk of liability for damages on Counts II, III, IV and VII of the Second Amended Complaint, does not establish the reasonableness of the allocation.

Towers Perrin asserts that Dillard's did not designate Mr. Schroeder as an expert and his analysis does not support its  allocation theory.  Towers Perrin relies on the contrary report of Gary Ford, Esq. as to Dillard's liability on Counts II, III and IV brought by the Class.

Turning to the question of liability, Towers Perrin alleges that Dillard's has conceded that all of its common law causes of action require proof that Dillard's was actually liable to the Class Plaintiffs on Count V, and the Court agreed with Dillard's when it previously held that its common law claims would not be ripe unless and until it were found liable in the Class Action.  Towers Perrin argues that all of Dillard's claims fail because Towers Perrin used the correct interest rate to compute lump sum payments, so that Dillard's had no liability under Count V and, consequently, on any other claims, which are premised on use of the incorrect interest rate.  Towers Perrin contends that calculation of the correct interest rate turns on two facts: (1) the Plan set the annuity starting date as January 23, 1999, and (2) payments were virtually all made within roughly 90 days of that date.  Towers Perrin acknowledges that an "annuity starting date" is the "first day of the first period for which an amount is paid as an annuity or any other form."  See 26 C.F.R. § 1.401(a)-20, Q & A-10(b)(1) (1999); see also 26 U.S.C. § 417(f)(2)(A)(ii) (defining the "annuity starting date" for "a benefit not payable in the form of an annuity" as "the first day on which all events have occurred which entitle the participant to such benefit.")  Towers Perrin argues, however, that the annuity starting date fixed in the Plan controls despite the delay in distributing the payments (virtually all

31

of which were distributed within three months following the annuity starting date)

because it was necessary to delay payments in order to complete benefit calculations.  As

support for its position, Towers Perrin relies on <u>Stephens v. U.S. Airways Group, Inc</u>.,

No. 4:00-CV-0144 (N.D. Ohio July 25, 2001) (unpublished decision), <u>rev'd on other gds</u>.,

464 F.3d 606 (6th Cir. 2006).  Doc. no. 247, exh. 81.  Towers Perrin also relies on the

administrative delay rule, which provides that "A payment shall not be considered to

occur after the annuity starting date merely because actual payment is reasonably delayed

for calculation of the benefit amount if all payments are actually made."  <u>See</u> 26 C.F.R. §

1.401(a)-20, Q & A-10(b)(3) (1999).  Towers Perrin contends that applicability of the

administrative delay rule to the facts of this case distinguishes this case from the decision

on which Dillard's relies, <u>Wilson N. Jones</u>, which did not discuss the rule.  Towers Perrin

asserts that because the lump sum calculations were properly computed using a fixed

annuity starting date of January 23, 1999, as opposed to the date of payment, the Plaintiff

Class could not have succeeded on Count V of the Class Action Complaint and Dillard's

derivative indemnification claim therefore fails.

Towers Perrin alleges that even if Dillard's had some viable indemnification

claims, its other claims fail for various reasons.  Specifically, Towers Perrin alleges that:

(1) Dillard's claims under ERISA fail for lack of statutory standing  and because Dillard's

cannot recover damages under ERISA;[3] (2) Dillard's has waived the alleged "time is of

---

[3]Dillard's has indicated that it is not pursuing claims under ERISA.  <u>See</u> doc. no. 254, pp. 72-73.

the essence" contract provision that is the basis for the breach of contract claim; (3) Dillard's tort claims fail because its tort damages are duplicative of the breach of contract damages; and (4) there is no evidence to support Dillard's tort theories.

In its reply, Dillard's seeks to refute Towers Perrin's argument that the Plan-specified annuity starting date will apply if payments are not made on that date because of reasonable administrative delay. Dillard's claims that this argument ignores the PBGC's position in Wilson N. Jones that the annuity starting date depends on the date of actual occurrence, as well as the district court's adoption of the PBGC's position. Dillard's argues that Wilson N. Jones is on point and that Towers Perrin's attempt to distinguish it based on the district court's failure to address the issue of administrative delay is unavailing. Dillard's argues that in light of the holding that the annuity starting date must be the date of distribution, reasonable administrative delay cannot alter the date and is legally irrelevant. Dillard's further contends that the argument ignores the language of the administrative delay regulation, which is limited to situations where "actual payment is reasonably delayed for calculation of the benefit amount," a situation that ordinarily arises in the annuity context. Dillard's further alleges that the facts demonstrate that Towers Perrin's failure to make payments during the 1998 Plan year was not due to the type of administrative delay contemplated by the regulation. Dillard's contends that no court has ever applied § 1.401-20(a)(2) Q & A 10(b)(3) to permit a plan sponsor to use a prior year's higher interest rate to calculate lump sum distributions made in a subsequent Plan year, and the sole case cited by Towers, Stephens, is not pertinent to this issue.

Dillard's contends that 29 C.F.R. § 4044.73 (2007) demonstrates liability.[4]

In addition, Dillard's continues to insist that the Court endorsed the Settlement Agreement's allocation of damages to the various counts. Dillard's argues that if the Court had determined that Count VI, to which the parties allocated $1.8 million, was more meritorious than Counts V and VIII, it would have ordered modification of the Settlement Agreement to allocate a higher percentage of the Settlement to those class members entitled to relief under Count VI; if the Court had concluded that Counts II, III and IV were meritorious, it presumably would have ordered that at least some of the Settlement be allocated to those participants who elected annuities in addition to those who elected lump sums; and based on the Court's "laudatory" comments to counsel at the final approval hearing, the Court found the amount of the Settlement to be fully adequate, thereby indicating that the Court found no merit to Count I.

Further, Dillard's challenges Towers Perrin's characterization of the fiduciary's report as hearsay, asserting that the report has already been filed with and accepted by the Court. Dillard's claims that "[a]s with this Court's analysis, the independent fiduciary could have and presumably would have objected had it not perceived that funds were allocated properly."

---

[4]Section 4044.73(a)(1) (2007) provides that "[t]he value of the lump sum or other alternative form of distribution is the present value of the normal form of benefit provided by the plan payable at normal retirement age, determined as of the date of distribution using reasonable actuarial assumptions as to interest and mortality." Subsection (b) provides that the same actuarial assumptions shall be used to determine values calculated under ¶ (a). Towers objects in its motion for leave to file sur-reply that Dillard's has not previously raised this claim and cannot properly raise it for the first time in a reply brief. See doc. no. 294.

As a final matter, Towers Perrin disputes that there is a problem with using the January 23, 1999, date arising from the Plan's failure to give notice at least 30 days prior to the annuity starting date to participants of their right to receive their benefit either as an annuity or as a lump sum. Towers Perrin acknowledges that there is generally a requirement of 30-days notice of the written explanation of the Qualified Joint and Survivor Annuity ("QJSA") required by § 417(a)(3) in order to pay a benefit as a lump sum distribution. See 26 C.F.R. § 1.417(e)-1(b)(3)(ii) (1999). Towers Perrin claims, however, that the Plan may choose to provide the required notice less than 30 days before the annuity starting date, and notice can even be provided after that date, so long as payment is made at least seven days after the notice is provided. See 26 U.S.C. § 417(a)(7)(A); 26 C.F.R. § 1.417(e)-1(b)(3) (1999). Towers Perrin claims that the notice requirement is satisfied here because virtually all election forms were distributed by the end of the week of January 11, 1999, and the first payments did not begin until February 8, 1999.

iii. Analysis

In the present case, there is no express contract of indemnification between Towers and Dillard's. Thus, the initial question is whether there is an implied right of indemnification, which is a legal determination for the Court to make. The second inquiry on summary judgment is whether there are issues of fact as to whether the three Globe requirements are satisfied; i.e., whether (1) Towers received proper and timely notice of the settlement, (2) legal liability required the settlement, and (3) the settlement

was fair and reasonable.

The Court finds that there may be an implied right of indemnification in this case. The Court, however, is unable to make this determination as a matter of law on summary judgment because there are factual issues that preclude a determination as to whether Dillard's was passively negligent or whether it can be considered a concurrent tortfeasor. As discussed later in this opinion, Towers Perrin assumed an obligation to perform actuarial and administrative services in connection with the distribution of benefits to Plan participants on Dillard's behalf.  Towers Perrin may be held liable for damages incurred by Dillard's in connection with the payment of those benefits if Dillard's was passively negligent with respect to the calculation and distribution of the benefits and if Towers Perrin caused the damages Dillard's seeks to recover.  Resolution of these issues must await the development of a full record at trial.

There are likewise questions of fact as to whether the three <u>Globe</u> requirements are satisfied.  First, Towers Perrin received proper and timely notice of the Settlement. Second, the Court determined that the Settlement was fair and reasonable.  However, in approving the Settlement, the Court expressed no opinion as to the reasonableness of the specific allocation of damages to Counts V and VIII.  The Court considered the issue in response to Towers Perrin's objection to the Proposed Settlement Agreement between the Plaintiff Class and Third-Party Plaintiffs on the ground that certain language could be construed as a release of claims by Towers Perrin, and Towers Perrin's concern about the allocation of the damages primarily to Counts V and VIII of the Class Complaint.  At the

36

status conference that preceded the fairness hearing, counsel for Dillard's argued that

Towers Perrin lacked standing to object to the Settlement. See doc. no. 237, p. 6. After

considering the parties' arguments regarding the allocation of damages in the Proposed

Settlement Agreement, the Court stated as follows:

> I view it as Dillard's unilateral subjective assessment of the legal issues.
> And if a ruling on a motion *in limine* is tentative, then a ruling on a motion
> *in limine* that hasn't been filed yet is exceedingly tentative. But I can't see
> that this would inure to the prejudice of Towers Perrin in the event that it
> went - - this matter went to trial. And all other things being equal, I would
> certainly be willing to incorporate some remarks to that effect in the Order
> that might eventually go on in terms of accepting the settlement and the
> Court's understanding, or counsel can do something to clarify for the
> record, if they wish.

Id., p. 15. In response, counsel for Dillard's argued that this issue was one to be resolved

at a later date and was not appropriate for consideration at the fairness hearing, where the

only issue before the Court would be whether the Settlement was fair to the Class. Id.

The Court then overruled Towers Perrin's objections, finding that Towers Perrin had no

standing because "there's no interest to Towers Perrin that is negatively or otherwise

affected in this settlement." Id., p. 20. The Court granted the motion for preliminary

approval of the Settlement. Id.

It is clear from the Court's remarks and rulings that although the Court ultimately

approved the final Settlement as fair and reasonable, the Court did not adjudge the

reasonableness of the allocation of damages to certain claims in the Class Complaint. To

the contrary, the Court expressly determined that the allocation was Dillard's subjective

and unilateral assessment of the claims. In finding that Towers Perrin had no standing to

object to the terms of the Settlement because, as a non-signatory, the Settlement would

not inure to the prejudice of Towers Perrin, the Court was foreclosing the possibility that

Towers Perrin would be bound by the allocation of damages voluntarily reached by the

other parties to this lawsuit, an allocation to which it did not consent.  Thus, although the

Court has adjudged the Settlement to be fair and reasonable, there has been no judicial

determination as to the reasonableness of the settling parties' allocation of damages to

certain claims as set forth in the Settlement Agreement.

As to whether legal liability required the Settlement, determination of this question

requires an analysis of the merits of the claims brought by the Plaintiff Class against

Dillard's and the amount of damages, if any, for which Dillard's could be held liable to

the Class.  An appropriate starting point for assessing Dillard's legal liability to the

Plaintiff Class is to determine whether the correct GATT rate was used in determining the

amount of the lump sum payments to the Plaintiff Class, or whether the payments were

calculated using an incorrect rate that was more favorable to Dillard's.  As explained

below, if an incorrect rate was used, then there is evidence in the record to support a

finding that the amount of damages incurred by the Plaintiff Class equaled or exceeded

the amounts paid in settlement of the Class claims.

Pursuant to 26 C.F.R. §1.417(e)-1(d)(3)(i) (1999), the "applicable interest rate" for

a month is "the annual interest rate on 30-year Treasury securities as specified by the

Commissioner for that month . . ." See doc. no. 269, exh. 20.  The applicable interest rate

to be used for a distribution is the rate as determined under §(d)(3) for the applicable

"lookback month."  26 C.F.R. § 417(e)-1(d)(4).  The applicable "lookback month" for a

distribution is the lookback month as described in ¶ (d)(4)(iii) for the month (or other

longer stability period as defined in ¶ (d)(4)(ii)) that contains the annuity starting date for

the distribution.  Id.  The time and method for determining the applicable interest rate for

each participant's distribution must be determined in a consistent manner that is

uniformly applied to all participants in the plan.  Id.

Paragraph (d)(4)(ii) requires a plan to specify the period for which the applicable

interest rate remains constant, such as one calendar month or one plan year.  Paragraph

(d)(4)(iii) provides that a plan must specify the lookback month that is used to determine

the applicable interest rate and that the lookback month may be the first, second, third,

fourth or fifth full calendar month preceding the first day of the stability period.

The Plan in this case had a lookback period pursuant to which the applicable

interest rates were 6.33% for the 1998 Plan year and 5.01% for the 1999 Plan year.  The

Plan as amended in 1998 provided for lump sum benefits under a formula that used an

annuity starting date, which the Plan defined as January 23, 1999, although actual lump

sum payments were not made until after that date.  The applicable statutes and regulations

indicate that where the date of distribution of a lump sum payment differs from the

annuity starting date specified in the plan, the annuity starting date is the date of

distribution.  See Title 26 U.S.C. § 417(f)(2)(A)(ii) (defining "annuity starting date" for a

benefit "not payable in the form of an annuity" as "the first day on which all events have

occurred which entitle the participant to such benefit"); 26 C.F.R. § 1.401(a)-20 Q & A-

39

10(b)(1) (defining "annuity starting date" for purposes of § 417 as "the first day of the first period for which an annuity is paid as an annuity or any other form.")  Determination of the correct annuity starting date is critical in this case because if the annuity starting date used for calculating benefits is the date specified in the Plan, then payments were properly calculated at the 6.33% rate.  If the annuity starting date is the date of distribution, then the payments should have been calculated using the 1999 Plan year rate of 5.01%.

Dillard's relies on the <u>Wilson N. Jones</u> decision to argue that the correct annuity starting date is the date of distribution, so that Dillard's was required to use the 1999 Plan year rate.  In <u>Wilson N. Jones</u>, before the plan termination process began, the plan defined "annuity starting date" as "having the meaning assigned in Section 417(f) of the Internal Revenue Code and regulations issued with respect thereto and shall be the first day of the first period for which an amount is payable (not the actual date of payment) as an annuity or any other form."[5]  After issuing notice of intent to terminate the plan to plan participants, the defendant amended the plan to provide that the annuity starting date was the termination date for purposes of determining the lump sum amount.  The PBGC conducted an audit, following which it determined that the lower 1996 Plan year GATT interest rate for the month in which lump sum distributions were made, not the rate for the annuity starting date specified in the amendment to the Plan, should have been used.  In

---

[5] Section 417(f) defined the "Annuity Starting Date" as "the first day on which all events have occurred which entitle the participant to such benefit."

40

arguing its position before the district court, the PBGC relied on 26 C.F.R. § 1.401-20

Q&A-10(b)(1) (1988), which defined the "annuity starting date" as the "first day of the

first period for which an annuity is paid as an annuity or any other form." The district

court held that under the applicable regulations and statutes, the date of distribution was

the annuity starting date for lump sum distributions. 250 F.Supp. at 684 (citing 26 U.S.C.

§ 417(f) and 26 C.F.R. § 1.401(a)-(20) Q & A 10(b)(1)). The Fifth Circuit affirmed,

finding the PBGC's interpretation of annuity starting date to be entitled to respect because

it was an action taken within the PBGC's area of expertise and it was consistent with the

Treasury Regulations interpreting the statutory provisions on which the order was based.

374 F.3d 362.

Towers Perrin seeks to distinguish Wilson N. Jones on two grounds: first, the court

there did not address the issue of administrative delay, and second, the PBGC in this case

purportedly concluded that the delay in distributing payments was reasonable. Towers

Perrin's attempts to distinguish Wilson N. Jones are unavailing. First, the PBGC made no

finding in this case as to whether the delay in distributing payments was reasonable. The

PBGC's determination to close its investigation of the Plan termination after Towers

Perrin explained that it had relied on administrative delay to use the 1998 Plan year rate

instead of the 1999 Plan year rate does not conclusively establish that the PBGC endorsed

Towers Perrin's theory that administrative delay justified use of the higher rate.

Second, although the Wilson N. Jones decision is not binding on this Court, the

Court finds the PBGC's arguments in that case for defining the annuity starting date for

lump sum distributions as the date of distribution to be persuasive.  The language of the regulations and statutes support such a interpretation.  Towers Perrin has not produced any authority to support a contrary interpretation of the applicable statutes and regulations and to indicate that the annuity starting date established in a plan controls when it deviates from the date of actual distribution of lump sum payments.[6]  Nor is such an interpretation sound as it would allow a Plan administrator to fix an annuity starting date without being bound by the date, leading to situations such as occurred in this case where distributions can be made after the fixed date at a rate that is less favorable to Plan participants.  Accordingly, the Court finds that the annuity starting date for the lump sum distributions in this case is the date of actual distribution.  Because the distributions occurred during the 1999 Plan year, the applicable interest rate for the lump sum distributions is the 5.01% GATT rate in effect for that Plan year.

Towers Perrin has raised an issue as to whether the distributions that were made in the 1999 Plan year were "reasonably delayed for calculation," so that they should be considered as having occurred prior to the annuity starting date of January 23, 1999,

---

[6]Towers Perrin argued in its motion for leave to file a sur-reply brief that 29 C.F.R. § 4041.28(c)(2) demonstrates that an annuity starting date specified in a plan trumps the actual distribution date.  That regulation provides the method of distribution upon closeout of a plan and states that for lump sum calculations, "In the absence of evidence establishing that another date is the 'Annuity Starting Date' under the Code, the distribution date is the Annuity Starting Date for purposes of selecting the interest rate to be used to value a lump sum distribution."  This regulation does not support use of an annuity starting date other than the date of distribution in this case because Towers Perrin has not pointed to a Code provision that would apply to establish the annuity starting date specified in the Plan rather than the date of distribution as the annuity starting date.

pursuant to the administrative delay rule.  Towers Perrin claims that the benefit

calculations were delayed because of difficulties with the Plan data.  It contends that is

was "deluged" with complaints of data inaccuracies from Plan participants after mailing

the Notice of Plan Benefits in November 1998.  Towers Perrin asserts that the data

problems were exacerbated by Dillard's firing of the Human Resources employees most

familiar with the company's personnel records of the Plan participants in November of

1998.  Towers Perrin claims that addressing the delays in calculating benefits caused by

the data problems in turn delayed sending the election forms containing the calculations

and the subsequent distributions.

In support of its administrative delay theory, Towers Perrin has submitted the

expert report of Franklyn McGrath, a "retired actuary with extensive experience in

managing large-scale pension plan terminations," who opines that Towers Perrin's

distribution of payments less than five months after election forms were mailed out

"certainly met or exceeded industry standards at the time."  Doc. no. 247, exh. 24.

Towers Perrin also notes that James Colburn, an actuary retained by Dillard's as an expert

in this case, testified that Plan terminations take "four to eight months at best."  Doc. no.

247, exh. 79.  Towers Perrin contends that "two of the nation's preeminent ERISA

attorneys - former PBGC General Counsel Gary Ford and Frank Cummings -  have

opined in this case that the administrative delay regulation applies and that Towers Perrin

therefore used the correct interest rate.  See doc. no. 247, exh. 15, ¶¶ 14-18; exh. 16, ¶¶

29-30.

The applicability of the administrative delay regulation is an issue for the Court to determine.  The Court concludes as a matter of law that the administrative delay rule cannot be applied in this case to alter the annuity starting date and, by extension, the interest rate applicable as of the annuity starting date.  The administrative delay rule plays no role in establishing the annuity starting date.  It speaks only to when a payment can be considered to have occurred.[7]  In other words, even if there has been reasonable delay in calculating benefits, the annuity starting date remains unchanged.  What changes is whether a payment can be considered as having occurred before or on the fixed date, even though it in fact occurred after that date.  A lump sum payment, for which the annuity starting date is the date of distribution, could never actually "occur after the annuity starting date," so that the administrative delay regulation would have no potential

---

[7]Section 1.401(a)-20 Q&A-10(b)(1)-(3) reads as follows:

Annuity starting date--(1) General rule. For purposes of sections 401(a)(11), 411(a)(11) and 417, the annuity starting date is the first day of the first period for which an amount is paid as an annuity or any other form.
(2) Annuity payments. The annuity starting date is the first date for which an amount is paid, not the actual date of payment. Thus, if participant A is to receive annuity payments as of the first day of the first month after retirement but does not receive any payments until three months later, the annuity starting date is the first day of the first month. For example, if an annuity is to commence on January 1, January 1 is the annuity starting date even though the payment for January is not actually made until a later date. In the case of a deferred annuity, the annuity starting date is the date for which the annuity payments are to commence, not the date that the deferred annuity is elected or the date the deferred annuity contract is distributed.
(3) Administrative delay. A payment shall not be considered to occur after the annuity starting date merely because actual payment is reasonably delayed for calculation of the benefit amount if all payments are actually made.

applicability to such a payment.  For these reasons, whether or not the delay in calculating benefits was reasonable has no bearing on what the appropriate annuity starting date for calculating benefits was in this case, or on the interest rate applicable as of that date.  The interest rate in effect on the annuity starting date applies, irrespective of whether the delay in calculating benefits was reasonable.

The Court's determination that the administrative delay regulation does not apply in this case does not mean that the evidence that the parties have offered in support of their respective positions concerning the applicability of the rule is immaterial to resolution of the parties' claims.  To the contrary, the evidence presented raises questions of fact as to who was responsible for determining the interest rate to use in calculating the lump sum distributions and whether Towers Perrin breached its contractual obligations to Dillard's or committed negligence or fraud in connection with its failure to distribute lump sum payments before the end of the 1998 Plan year, as well as whether Dillard's made false representations to Towers Perrin.  Accordingly, the Court has considered the evidence in connection with the claim for indemnification and the breach of contract and tort claims.

To conclude on the indemnification claim, because the lump sum distributions to the Plaintiff Class should have been calculated using a 5.01% interest rate, Dillard's was legally liable to the Class for paying lump sum distributions calculated at the higher 6.33% rate.  There is evidence that Dillard's liability to the Plaintiff Class based solely on the failure to pay distributions to Plan participants at the lower rate exceeded the $35

45

million that Dillard's paid to settle the Class claims.  See doc. no. 217, Appx. 3, Sally

Cuni Expert Report.  Accordingly, Dillard's is entitled to pursue its claim for

indemnification against Towers Perrin on the ground that Towers Perrin is potentially

liable for the damages incurred as a result of erroneous lump sum payments to the

Plaintiff Class.

Dillard's posits as another theory of liability on Count V that Towers Perrin's use

of both 1998 and 1999 Plan year interest rates to calculate lump sum distributions made

during the 1999 Plan year renders Dillard's legally liable to respond to the Plaintiff Class

on that count under 26 C.F.R. § 1.417(e)-1(d) (1999).[8]  Dillard's claims that it is liable

under the regulation because Towers Perrin used the 1999 Plan year rate for 400 Plan

participants while using the 1998 Plan year rate for all others.  Dillard's further contends

that there is liability to the Plaintiff Class under Count V based on (1) Towers Perrin's

failure to send election forms allowing participants to choose annuity or lump sum

payments to Plan participants in time for them to receive the forms at least 30 days before

the Plan's designated annuity starting date of January 23, 1999, and (2) Towers Perrin's

failure to provide Plan participants an affirmative waiver and notice of right to rescind for

retroactive notices.  See 26 U.S.C. § 417(a)(3) and (a)(7); 26 C.F.R. § 1.417(e)-1.

Dillard's claims that it agreed with Towers Perrin that all election forms would be sent on

December 18, 1998, so that participants would have 30 days to exercise their election

_____

[8]That regulation provided in subsection (4(i)) that the "time and method for determining
the applicable interest rate for each participant's distribution must be determined in a consistent
manner that is applied uniformly to all participants in the plan."

before January 23, 1999, with time for mail service.  Towers Perrin argues that the regulations in effect in 1999 did not require that election forms be mailed more than 30 days before the annuity starting date.

The Court need not address these particular arguments at the summary judgment stage.  Because there is an issue as to whether Towers Perrin can be held liable for the full amount of damages incurred by Dillard's in the settlement of the Plaintiff Class's claims under a theory of indemnification based on use of an incorrect interest rate, summary judgment on the indemnification claim is not warranted, regardless of whether other regulatory violations may have occurred in connection with the distributions.

b. Breach of contract claim

Dillard's claims that the letters dated November 13, 1998 and December 18, 1998, and accompanying schedules which Towers Perrin sent to Dillard's CFO Freeman[9] constitute a contract by which Towers Perrin reduced to writing an agreement made at the October 7, 1998, meeting in Little Rock to send election forms to Plan participants by December 18, 1998, and to cause distributions to be made by the end of the 1998 Plan year, i.e., January 30, 1999.  Dillard's claims that it performed on the contract by paying Towers Perrin more than $1.5 million in fees in exchange for Towers Perrin's performance.  Dillard's further claims that Towers Perrin breached its contract by failing to provide certain "Deliverable[s]" by the "Due Date[s]" set forth in the schedule attached to the December 18, 1998 letter and that Towers Perrin's failure to perform exposed

---

[9]Doc. no. 256, exhs. 12, 13.

47

Dillard's to the claims asserted in Counts V and VIII, which would not have been asserted against it had Towers Perrin performed its obligations under the contract.

In response, Towers Perrin does not dispute that it had a contract with Dillard's "to perform various administrative and actuarial services in connection with the Plan termination in exchange for payment." Towers Perrin disputes, however, that the contract was reduced to writing in the two letters. Towers Perrin asserts that neither letter purports to be a written contract and neither contains a signature block for Dillard's to indicate its assent to the terms of the letter. Towers Perrin contends that the letters are nothing more than status reports issued after Dillard's had retained and hired Towers Perrin. Towers Perrin denies that there was an oral agreement reached at a meeting on October 7, 1998, to complete lump sum payments by January 30, 1999. Towers Perrin also contends that Dillard's representatives gave conflicting testimony as to the "supposed due date" for its performance, with Dillard's CFO Freeman testifying that Towers Perrin promised to distribute all lump sums by January 22, 1999 (doc. no. 256, exh. 9, Freeman depo., p. 138), Mr. Schroeder testifying that Towers Perrin promised to complete all lump sum distributions by January 30 or 31, 1999 (doc. no. 256, exh. 10, Schroeder depo., pp. 79-80, 88), and Dillard's counsel Mr. Hurst testifying that Towers Perrin promised to make "substantially all" distributions by January 30, 1999. Doc. no. 256, exh. 11, Hurst depo., pp. 101-106.

Towers Perrin alleges that even if there was a contract to distribute payments by a certain date, there is an issue as to whether it breached the contract. Towers Perrin

contends that the "Comments" section of the schedule indicates that the January 23, 1999, due date for lump sum distributions "[a]ssumes no comments from the PBGC or other issues that delay the distribution," and a reasonable fact-finder could determine that "other issues" delayed the payment.

Altering course for purposes of its motion for summary judgment only, Towers Perrin does not dispute that the two letters it sent to Dillard's constitute a fully integrated written contract in which time was of the essence. Towers Perrin argues, however, that Dillard's waived any right to insist upon performance by that date. Towers Perrin alleges that Dillard's accepted later performance than that specified in the schedules by allowing Towers Perrin to complete the lump sum payments in February, March and April of 1999, which constituted a "clear waiver of any right to performance by January 23 . . ." so as to entitle Towers Perrin to summary judgment on the breach of contract claim. Towers Perrin argues that Dillard's attorney Mr. Hurst informed Towers Perrin's Jay Popky that Dillard's had agreed that lump sum distributions could be delayed until February of 1999. Towers Perrin further contends that in light of its repeated statements that distributions would be delayed, silence by Dillard's amounted to a waiver. Towers Perrin claims that it had repeatedly warned Dillard's that lump sum distributions would not be made by January 23, 1999. Specifically, Towers Perrins claims that Mr. Klubock orally informed Mr. Hurst on September 28, 1998, that it was highly unlikely that Towers Perrin would be able to calculate all accrued benefits and have employee elections by the end of the year; at the October 7, 1998, meeting, Towers Perrin warned Dillard's that the proposed

49

schedule was unrealistic; Towers Perrin purportedly orally informed Mr. Hurst in December 1998 that payments would not commence until February 1999, and on December 29, 1998, Mr. Klubock wrote a memo to Mr. Hurst confirming that the Plan would be amended to fix the annuity starting date as January 23, 1999, regardless of administrative delay; Towers Perrin informed Dillard's on December 18, 1998, that distributions would be delayed because of data problems; and Towers Perrin informed Dillard's via a draft "Q & A" attached to an e-mail dated January 13, 1999, that lump sum payments would not begin until February 28, 1999.

Towers Perrin goes on to argue that, assuming it breached the purported contract by not distributing lump sum payments by January 23, 1999, there is an issue of fact as to whether the breach caused any non-speculative damages. Towers Perrin contends that in order to establish damages, Dillard's must show that (1) it was actually liable under Count V, and (2) that portion of the Settlement payment allocated to Count V is not speculative. Towers Perrin contends that Dillard's can show neither.

Dillard's denies that it waived Towers Perrin's alleged breaches of the parties' contract, claiming that it sought performance in a timely fashion through the end of the 1998 Plan year and it was unable to take any action after that time. Dillard's argues that it engaged in no conduct that evinced "in some unequivocal manner an intent to waive." Dillard's alleges that, at most, Towers Perrin claims that Dillard's was silent as to its performance, which does not constitute a waiver. Dillard's further contends that the evidence demonstrates that it identified Towers Perrin's breaches, Towers Perrin wrongly

50

advised it that administrative delay would be a defense, and it had no choice but to proceed with the termination of the Plan already in progress.

To prove a breach of contract, a plaintiff must establish the existence of a contract, performance by the plaintiff, breach by the defendant, and damage to the plaintiff. Doner v. Snapp, 98 Ohio App.3d 597, 600, 649 N.E.2d 42, 44 (1994). A contract "includes every description of an agreement or obligation, whether verbal or written, whereby one party becomes bound to another to pay a sum of money or to perform or omit to do a certain act." Terex Corp. v. Grim Welding Co., 58 Ohio App.3d 80, 568 N.E.2d 739, 740, syll. ¶ 1 (1989). To prove the existence of a contract, the claimant must show that there was an offer, acceptance, and consideration. Kirkland v. St. Elizabeth Hospital, 120 F. Supp.2d 660, 669 (N.D. Ohio 2000). Moreover, for a contract to exist, the parties must have a meeting of the minds. Noroski v. Fallet, 2 Ohio St.3d 77, 79, 442 N.E.2d 1302, 1304 (1982). The contract must also be definite as to its essential terms. Kirkland, 120 F. Supp.2d at 669.

"The interpretation of a written agreement is, in the first instance, a matter of law for the court." Seringetti Constr. Co. v. City of Cincinnati, 51 Ohio App.3d 1, 4, 553 N.E.2d 1371, 1375 (1988) (citing Alexander v. Buckeye Pipe Line Co., 53 Ohio St.2d 241, 374 N.E.2d 146 (1978)). The primary role of the court in examining a written instrument is to ascertain and give effect to the intentions of the parties. Foster Wheeler Enviresponse, Inc. v. Franklin County Convention Facilities Authority, 78 Ohio St.3d 353, 361, 678 N.E.2d 519, 526 (1997) (citing Aultman Hosp. Assn. v. Comm. Mut. Ins.

51

Co., 46 Ohio St.3d 51, 53, 544 N.E.2d 920, 923 (1989)).  "The intent of the parties to a contract is presumed to reside in the language they chose to employ in the agreement." Id. (citing Kelly v. Med. Life Ins. Co., 31 Ohio St.3d 130, 509 N.E.2d 411, syll. ¶ 1 (1987)). A writing or writings which are executed as part of the same transaction will be read as a whole, and the parties' intentions as to each part will be gathered from consideration of the whole. Id. (citations omitted).

The issue of waiver is a mixed question of law and fact.  Sandler v. AII Acquisition Corp., 954 F.2d 382, 385 (6th Cir. 1992) (citing Cordrey v. Euckert, 917 F.2d 1460, 1465 (6th Cir. 1990)).  "Waiver may be expressed by words or conduct which makes a party's performance impossible, or which dispenses with complete performance at a time when the obligor may fully perform."  Id. (citing White Co. v. Canton Transp. Co., 131 Ohio St. 190, 2 N.E.2d 501, 505 (1936)). An implied waiver occurs when a party "has been prejudicially misled or lulled into believing strict compliance is not required." Id.  (citing McMillen v. Willys Sales Corp., 118 Ohio App. 20, 193 N.E.2d 160, 164 (1962)).

A "time is of the essence" provision may be waived "when the party to be benefited 'does any act inconsistent with the supposition that he continues to hold the other party to his part of the agreement.'" Id. (citations omitted). The party's actions must "evince in some unequivocal manner an intent to waive . . ."  Id. (citation omitted).

While Towers Perrin now concedes that it had a contract with Dillard's to provide various actuarial and administrative services in exchange for payment, there are genuine

issues of material fact as to the scope of the parties' contract.  The parties have offered conflicting evidence as to what they intended the terms of their agreement to be.  Thus, the Court must hear and weigh the evidence in order to determine the scope and terms of the parties' agreement.  Assuming the evidence reveals that Towers Perrin was contractually bound to provide services within a specified time frame, there are questions of fact underlying resolution of the issue of whether data issues excused Towers Perrin's timely performance and, if not, whether Dillard's waived Towers Perrin's timely performance.  Finally, there is evidence that Dillard's was damaged as a result of Towers Perrin's failure to make the distributions in accordance with the schedule as it was purportedly contractually bound to do.  For these reasons, summary judgment in favor of either party on the breach of contract claim is not warranted.

c.  Tort claims

Towers Perrin claims that Dillard's tort claims must fail because they are duplicative of the breach of contract claims.  Towers Perrin alleges that in order to raise both contract and tort claims in the same action, the plaintiff must show damages attributable to the alleged tort which are in addition to those attributable to the breach of contract, which Dillard's has failed to do.

Dillard's argues that its tort claims are not barred, but instead Dillard's may plead them in the alternative because Towers Perrin  has denied that a contract existed between it and Dillard's.  See Answer to Second Amended Third-Party Complaint; Counterclaims against Dillard's; Fourth-Party Complaint against Friday-Eldredge, doc. no. 97, ¶ 9.

Dillard's contends that it must continue to pursue its claims in the alternative because Towers Perrin has conceded only for purposes of its summary judgment motion that the letters in question constituted a written contract. Dillard's further alleges that it has offered sufficient evidence to support its tort claims.

In response, Towers Perrin contends that Dillard's misrepresents its position in that it does not deny the existence of a contract, only the scope of the contract.  Towers Perrin also alleges that the tort claims have no merit because it provided numerous warnings that the distributions would be delayed and it had no duty to provide legal advice regarding the appropriate interest rate to be used.

Under Ohio law, the existence of a contract action generally precludes a party from presenting the same case as a tort claim.  Wolfe v. Continental Cas. Co., 647 F.2d 705, 710 (6th Cir. 1981). In order to pursue both contract and tort claims in the same action, a party must show a duty existing independent of that created by the contract and "actual damages attributable to the wrongful acts of the alleged tortfeasor which are *in addition* to those attributable to the breach of contract."  See Textron Fin. Corp. v. Nationwide Mut. Ins. Co., 115 Ohio App.3d 137, 151, 684 N.E.2d 1261, 1270 (1996) (citations omitted); Medical Billing, Inc. v. Medical Mgmt. Sciences, Inc., 212 F.3d 332, 338 (6th Cir. 2000). A party may, however, plead claims for breach of contract and negligence in the alternative.  Transcontinental Ins. Co. v. SimplexGrinnell LP, 2006 WL 2035571 * 7 (N.D. Ohio 2006) (unpublished decision) (citing Corporex Dev. & Construction Mgmt. v. Shook, Inc., 106 Ohio St.3d 412, 414, 835 N.E.2d 701 (2005)); see also Bonner Farms,

Ltd. v. Power Gas Marketing & Transmission, Inc., 2007 WL 2463247 *14 (N.D. Ohio 2007) (unpublished decision) (although a party may not recover damages for both breach of contract and promissory estoppel or unjust enrichment, it may pursue both types of claims where there is a dispute as to the existence or enforceability of a contract.)  Where the duties imposed upon the parties are governed by contract, then contract law governs the recovery.  Transcontinental, 2006 WL 2035571 at *7.

Although Towers Perrin now concedes that the parties had a contract for services, the scope and terms of the contract remain unclear.  Towers Perrin does not concede for purposes of this lawsuit that the parties' contract covered the timing of the lump sum distributions to Plan participants.  Given Towers Perrin's position and the uncertainty surrounding the scope of the parties' contractual agreement, the Court cannot say at this juncture that the existence of a contract precludes Dillard's from pursuing damages under a tort theory.  Thus, Dillard's may proceed to trial on both its breach of contract and tort claims.  The Court reserves judgment on whether Dillard's is entitled to recover damages under a tort theory pending the development of a complete record at trial.

1.  Negligence claim

The elements of a negligence claims are (1) a legal duty, (2) a breach of that duty, and (3) damages directly and proximately caused by the breach.  See Wallace v. Ohio DOC, 96 Ohio St.3d 266, 274, 733 N.E.2d 1018, 1025 (2002).  Dillard's claims that the evidence demonstrates beyond dispute that Towers Perrin assumed a duty to pay lump sums to Plan participants by the end of the 1998 Plan year and recognized that it had such

an obligation; it breached that duty by processing none of the returned election forms during the 1998 Plan year; and the breach of the duty caused damage to Dillard's.

Dillard's also alleges that it has demonstrated facts entitling it to judgment on its negligent misrepresentation claim. Dillard's claims that Towers Perrin repeatedly provided it with schedules depicting due dates for mailing election forms and paying lump sums which, if met, would have precluded the Plaintiff Class's argument that the wrong interest rate had been used. Dillard's alleges that, at the very least, Towers Perrin was negligent in failing to make payments before the January 30, 1999, deadline for the 12,000 individuals who returned election forms before the deadline.

Towers Perrin contends that there are issues of fact on the negligence claim for the same reasons set forth in connection with the breach of contract claim since Dillard's relies on the same theory in support of both claims.

The record discloses that there are issues of fact as to whether Towers Perrin is liable under a theory of negligence for its failure to pay lump sum distributions to Plan participants by the end of the 1998 Plan year. Accordingly, neither party is entitled to summary judgment on the negligence claim.

## 2  Professional malpractice claim

Professional malpractice is "the failure of one rendering services in the practice of a profession to exercise that degree of skill and learning normally applied by members of that profession in similar circumstances." Strock v. Pressnell, 38 Ohio St.3d 207, 211, 527 N.E.2d 1235, 1239 (1988). In order to prove a claim for malpractice or professional

negligence, a plaintiff must establish "the applicable standard of care recognized by the [professional] community, usually through expert testimony. Second, a plaintiff must show a negligent failure on the part of the [professional] to meet the standard of care or render [services] conforming to this standard. Finally, a direct causal connection must be demonstrated between the [negligent] act and the injury." Scatamacchio v. W. Res. Care Sys., 161 Ohio App.3d 230, 236, 829 N.E.2d 1247, 1251 (2005) (citing Starkey v. St. Rita's Med. Ctr., 117 Ohio App.3d 164, 690 N.E.2d 57 (1997) and Bruni v. Tatsumi, 46 Ohio St.2d 127, 346 N.E.2d 673 (1976)). "The expert testimony must explain what a [professional] of ordinary skill, care, and diligence in the same [professional field] would do in similar circumstances." Id. at 236, 829 N.E.2d at 1251-52 (citing Bruni, 46 Ohio St.2d at 131, 346 N.E.2d 673).

Dillard's offers the expert opinion of James Colburn, a Retirement Consultant and Actuary, that Towers Perrin deviated from the standard of care for actuaries and consultants (1) by failing to meet a critical deadline with no written warning to Dillard's that the failure was in the realm of possibility or likelihood, and (2) by attempting to cover up the client's loss from Towers Perrin's failure to meet the 1998 Plan year deadline with a "stretch interpretation" of the November 1998 amendment without disclosing the risk that Towers Perrin's proposed interpretation may not survive judicial or regulatory challenge (the "stretch interpretation" being that a specified annuity starting date established by an "11th-hour amendment," coupled with reference to "administrative delay," would preempt the actual date of distribution for purposes of determining the

maximum allowable interest rate).  Dillard's contends that Towers Perrin has not successfully challenged Mr. Colburn's opinion and points to evidence in the record indicating that Towers Perrin knew it would not make payments before the end of the 1998 Plan year, even though it could have done so for at least some participants.

Towers Perrin contends that even if Dillard's could assert a claim for malpractice, it has failed to produce expert testimony to show that Towers Perrin deviated from the standard of care.  Towers Perrin alleges that the malpractice allegation based on the interpretation of the November 1998 Plan amendment is actually an allegation of legal malpractice, which is without merit because Towers Perrin was not retained to provide legal services.  Regarding the alleged failure to provide warnings, Towers Perrin claims that the evidence is undisputed that it warned Dillard's that not all payments would be distributed by January 23, 1999, and at a minimum, such evidence creates an issue of fact as to whether Mr. Colburn's report establishes that Towers Perrin breached its professional duties.  Towers Perrin has also submitted an expert report from an actuary, Franklyn McGrath, concluding that it acted in accordance with the applicable standard of care.

The record discloses that there are questions of fact underlying resolution of the issue of whether Towers Perrin failed to meet the applicable standard of care for an actuarial firm when providing services to Dillard's in connection with the termination of the Plan.  Specifically, there are questions of fact as to what role Towers Perrin played in determining the appropriate interest rate to be applied so that it is not clear to what extent,

58

if any, Towers Perrin can be held accountable for that decision.  There are also questions of fact underlying resolution of the issue of whether Towers Perrin met the applicable standard of care with respect to its duties in distributing payments.  These issues of fact are material and preclude summary judgment on the professional malpractice claim.

3.  Negligent and fraudulent misrepresentation claims

      A claim for negligent misrepresentation lies under the following circumstances:

> One who, in the course of his business, profession or employment, or in any
> other transaction in which he has a pecuniary interest, supplies false
> information for the guidance of others in their business transactions, is
> subject to liability for pecuniary loss caused to them by their justifiable
> reliance on the information, if he fails to exercise reasonable care or
> competence in obtaining or communicating the information.

Delman v. City of Cleveland Hts., 41 Ohio St.3d 1, 4, 534 N.E.2d 835, 838 (1989).  A

claim for negligent misrepresentation must be based on affirmative statements or acts.

Textron, 115 Ohio App.3d at 149, 684 N.E.2d at 1269.

      In order to establish a fraudulent misrepresentation claim under Ohio law, a

plaintiff must establish the following elements: 1) a representation, 2) which is material to

the transaction at hand, 3) made falsely, with knowledge of its falsity, or with such utter

disregard and recklessness as to whether it is true or false that knowledge may be

inferred, 4) with the intent of misleading another into relying upon it, 5) justifiable

reliance upon the representation, and 6) a resulting injury proximately caused by the

reliance.  Burr v. Bd. of County Commrs. of Stark County, 23 Ohio St.3d 69, 73, 491

N.E.2d 1101, 1105 (1986).

      Generally, a claim for fraud or negligent misrepresentation cannot be based on

representations of a future action or event.  Yo-Can, Inc. v. The Yogurt Exchange, Inc.,

149 Ohio App.3d 513, 525, 778 N.E.2d 80, 89 (2002);  Isaac v. Alabanza Corp., 2007

WL 901596, *7 (2007) (unpublished decision) (citing Yo-Can and Phillips v. State Farm

Fire & Casualty Co., 12th Dist. No. CA92-11-215, *3  (Sept. 27, 1993) (unpublished

decision)).  An exception applies when, at the time the representation was made, the party

had no intention of carrying out the promised act.  Isaac, 2007 WL 901596 at *7;

Williams v. Edwards, 129 Ohio App.3d 116, 124, 717 N.E.2d 368, 374 (1998).

Dillard's claims that Towers Perrin never warned it that none of the payments

would be made on schedule and, at most, put it on notice that a limited number of

payments would be delayed.  Dillard's alleges that the evidence demonstrates that Towers

Perrin repeatedly provided it with schedules demonstrating the due dates for mailing

election forms and paying lump sums would be met; these representations were made for

the purpose of updating Dillard's on the termination of the Plan and were relied upon; and

Towers Perrin's failure to advise Dillard's of its inability to meet the deadlines deprived

Dillard's of the opportunity to either halt the termination until a more favorable interest

rate resulted or to insist on increased staffing to allow the termination to proceed on

schedule.  Dillard's also alleges that Towers Perrin committed fraud by concealing that it

could not complete the Plan termination by the end of the 1998 Plan year while making

affirmative misrepresentations that it could complete most of the payments by the

scheduled dates.

Towers Perrin alleges that Dillard's theories of fraud and negligent

misrepresentation fail because if Dillard's chose to rely on the legal advice of an actuarial

accounting firm, its reliance was not reasonable.  Towers Perrin also claims that any

alleged statements as to the legal effect of using a particular annuity starting date, at most,

constitute a statement of opinion as to how a court may rule in the future.  Towers Perrin claims that the evidence is undisputed that it warned Dillard's that not all payments would be distributed by January 23, 1999, and at a minimum, there are triable issues of fact.

The record discloses that there are genuine issues of material fact as to whether Towers Perrin made negligent or intentional misrepresentations regarding its intent or capability to distribute lump sum payments before the end of the 1998 Plan year.  These issues of fact preclude summary judgment on the claims for negligent and fraudulent misrepresentation.

3.  <u>Third-Party Plaintiffs' motion for summary judgment on Towers Perrin's counterclaim (doc. no. 240)</u>

Third-Party Plaintiffs have filed a motion for summary judgment on Towers Perrin's counterclaim.  Doc. no.  240.  Towers Perrin opposes the motion.  Doc. no. 256, pp. 30-31.  Third-Party Plaintiffs have filed a reply in support of the motion.  Doc. no. 266.

Towers Perrin asserts a counterclaim against Dillard's for misrepresentation, negligent misrepresentation and breach of contract.  See doc. no. 97, ¶¶ 91-136.  Third-Party Plaintiffs describe the counterclaim as seeking recovery of "$150,000 in fees that Dillard's, Inc. never paid to Towers for the services provided in terminating the [Plan]," "[u]nliquidated damages . . . resulting from Dillard's untimely payment of fees to Towers Perrin for the services provided by Towers Perrin in terminating the [Plan]," and "the harm suffered by Towers Perrin in defending the claims in this lawsuit that are not well-

founded in either law or fact."  <u>See</u> Aff. of Jack Fuchs, exh. 1, Towers Perrin's Response

to the Committee's Interrogatory No. 9.  Third-Party Plaintiffs claim they are entitled to

judgment insofar as Towers Perrin seeks recovery of $150,000 in fees as well as

unliquidated damages because Towers Perrin's principal, Richard Sponenbergh, executed

a "Fee Dispute Settlement" on January 7, 2000, which covers, and releases payment of,

those amounts.  <u>See</u> "Fee Dispute Settlement," doc. no. 240, attach. 24.  Third-Party

Plaintiffs contend they are entitled to judgment on any claim for damages allegedly

incurred by Towers Perrin in defending this lawsuit because the American Rule

governing attorney fees bars the payment of fees to Towers Perrin and Towers Perrin

cannot identify any harm it has suffered in defending this lawsuit.

Towers Perrin alleges that Dillard's, the only party named as a Defendant to the

counterclaim, is not entitled to summary judgment based on the "Fee Dispute Settlement"

because it was not a party to the Agreement, so that Towers Perrin's claims against

Dillard's were not encompassed by the release.  Towers Perrin alleges in a footnote that if

the Fee Dispute Settlement did encompass the claims between it and Dillard's that existed

as of January 7, 2000, then any claims related to alleged untimely payment of lump sum

benefits to Plan participants in 1999 were likewise extinguished by the Settlement.

Towers Perrin reasons that because its failure to send payments out to participants by the

end of January 1999 was the basis for Dillard's objection to the fees charged by Towers

Perrin, any Settlement as to the fees necessarily encompassed any claims relating to the

alleged late payments.  Towers Perrin does not address Third-Party Plaintiffs' claim that

the American Rule bars the payment of fees to Towers Perrin and that Towers Perrin cannot identify any other harm it has incurred in defending this lawsuit.

In reply, Dillard's points to evidence to support its position that the Fee Dispute Settlement was reached between it and Towers Perrin, so that Towers Perrin is barred from seeking to recover the amounts covered by the Settlement.  Dillard's also notes that the language of the Settlement addresses only the fee dispute and does not refer to any other claims. Dillard's goes on to address for the first time in its reply Towers Perrins' allegation of misrepresentation and fraud based on Dillard's allegedly "misrepresenting the quality of the Plan participant data," claiming that the allegation is frivolous and Towers Perrin fails to allege any damages resulting from the alleged misrepresentation.

"A release of a cause of action for damages is ordinarily an absolute bar to a later action on any claim encompassed within the release."  Hill v. McCrabb, 19 Fed. Appx. 314, 315 (6th Cir. 2001) (quoting Haller v. Borror Corp., 50 Ohio St.3d 10, 552 N.E.2d 207, 210 (1990)).  The Fee Dispute Settlement clearly encompasses Towers Perrins' claim against Dillard's for $150,000 in fees and unliquidated damages resulting from the untimely payment of fees.  The letter setting forth the terms of the Settlement is on Dillard's letterhead and was sent to Towers Perrin by John Hawkins in his capacity as Vice President/Treasurer of Dillard's.  The letter is addressed to Paul J. Cascio, FSA, at Towers Perrin.  The letter states that it "will confirm the terms of settlement of the current fee dispute for the Pension and Profit Sharing Plans."  The Agreement provides, in pertinent part, as follows:

64

The Trustees agree to pay the full amount of previously unpaid invoices ($1,413,543) less an agreed upon reduction of $150,000, subject to the following points of clarification and conditions:

1.  The balance to be paid will not include any interest charges on either the Pension Plan or the Savings and Profit Sharing Plan;

2.  If necessary, Towers Perrin will perform additional follow up work . . . of up to $50,000 . . . without charge . . .

3.  The Plan will pay the agreed upon balance immediately, less a $200,000 reserve . . .

The letter is signed by Hawkins and by Sponenbergh, who indicated by his signature that he was acknowledging and accepting the agreement on behalf on Towers Perrin.

It is clear from a review of the letter that Dillard's was a party to the Fee Dispute Settlement.  Although the letter refers to amounts the Trustees and the Plan agree to pay, Hawkins' signature binds Dillard's to the Agreement.  Although it is not necessary to look beyond the face of the Agreement, the Court notes that Towers Perrin has not presented any evidence to indicate that the parties did not intend for Dillard's to be bound by the Agreement.

Towers Perrin does not argue that the Settlement does not otherwise encompass the "$150,000 in unpaid fees and the "[u]nliquidated damages . . . resulting from Dillard's untimely payment of fees to Towers Perrin for the services provided by Towers Perrin in terminating the [Plan]" that Towers Perrin seeks in its counterclaim.  Thus, Dillard's is entitled to summary judgment insofar as Towers Perrin seeks to recover these amounts as part of its counterclaim.  Towers Perrin's attempt to extend the Settlement to claims

related to alleged untimely payment of lump sum benefits to Plan participants fails because the Settlement does not address those claims.

Dillard's is likewise entitled to summary judgment on Towers Perrin's claim for damages allegedly incurred in defending this lawsuit in light of Towers Perrin's failure to address Dillard's argument that the American Rule, which holds that attorney fee awards are not appropriate unless authorized by statute or court rule,[10] bars the payment of fees to Towers Perrin.

Finally, the Court will not address Dillard's arguments regarding Towers Perrin's allegations of misrepresentation and fraud based on Dillard's allegedly "misrepresenting the quality of the Plan participant data." These allegations are unrelated to the allegations of unpaid fees, and Towers Perrin has not had an opportunity to address the arguments since Dillard's raised them for the first time in its reply brief.

To conclude, the motion for summary judgment on Towers Perrin's counterclaim (doc. no. 240) is **GRANTED** insofar as Towers seeks to recover "$150,000 in unpaid fees and the "[u]nliquidated damages . . . resulting from Dillard's untimely payment of fees to Towers Perrin for the services provided by Towers Perrin in terminating the [Plan]" and insofar as Towers Perrin seeks to recover as damages fees incurred in defending this lawsuit. The motion is **DENIED** as to all remaining allegations in the counterclaim.

---

[10] Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240 (1975); O'Hara v. Bd. of Educ., 72 Fed. Appx. 311, 315 (6th Cir. 2003).

III.  Conclusion

In accordance with the foregoing, the Court hereby **ORDERS** that the following motions are **DENIED:** Towers Perrin's motion to strike affidavit (doc. no. 253), motion for leave to file sur-reply (doc. no. 294), motion to exclude expert report and testimony (doc. no. 304), and motion for summary judgment (doc. no. 247), and Third-Party Plaintiffs' motion to strike motion (doc. no. 297), motions to exclude expert reports and testimony (docs. no. 250, 252, 305), and motions for summary judgment (docs. no. 242 and 243).

Third-Party Plaintiffs' motion for summary judgment on Towers Perrin's counterclaim (doc. no. 240) is **GRANTED** in part and **DENIED** in part.

Towers Perrin's motion for summary judgment on the Plan's and Committee's claims (doc. no. 248) is **GRANTED**.

**IT IS SO ORDERED.**


Date:  10/2/07                                   S/Sandra S. Beckwith
                                                 Sandra S. Beckwith, Chief Judge
                                                  United States District Court